3 23 0 1 2 2 in re marriage of Juanito Rios Salazar appellant and Jesus Rios happily. Thank you. Good afternoon. Good afternoon, your honors. Good afternoon. Mr. Angel, are you ready to proceed? I'm ready. Okay, you may you may go. Uh, Justice McDade, Justice Holdridge, Justice Davenport, uh, attorney Bertrand, may it please the court. Um, this case involves the marriage of Juanita Rios, now known as Juanita Salazar and Jesus Rios. Um, it's an interesting case in the sense that the parties, this was the party's second marriage. They were initially married, I believe in 1972 and the first marriage was dissolved in 1991. They became remarried in on September 27, 2010 and a petition for dissolution of marriage was filed June, um, 15th of 2018 and basically there's three issues in this appeal. The first issue concerns an account in Jesus Rios name at Federal Savings Bank. Uh, the second issue concerns a dissipation of funds from that account and the third issue is, um, denial of maintenance. Um, with respect to the first issue, the, uh, first Federal Savings Bank account, this is an account which, um, was Mr. Rios account, uh, before the, um, marriage, before the remarriage and I believe it was in record page 70 where his only account, um, during the marriage and what happened in this case is that the parties were remarried on September 27th of 2010 and then Mr. Rios worked, um, this is the record page 98, one year after the marriage and when, during which point he's receiving a marital paycheck. He's receiving a paycheck, which is of course marital funds and he's also receiving, he's also earning pension benefits, which, um, those benefits earned during the marriage would also be marital property. So, um, in this case, the burden of proof was on Mr. Rios to prove that this, uh, first Federal Savings Bank account was his property by clear and convincing evidence and initially the trial court, um, said that he did not do that. Uh, although the trial court changed its opinion upon, uh, reconsideration based on some, uh, information, which isn't consistent with the record. Um, so Mr. Rios said on page 124 that, um, his paycheck, actually on page 124 of the record, uh, Mr. Rios addressed the paycheck issue with his attorney saying that that went into the party's joint checking account, but nothing was ever presented to that. And that's also attorney Bertrand saying that that's not any testimony of, uh, of Mr. Rios that that were this, uh, pay or the paychecks went for one year of the marriage. Uh, in preparing for this, I did what was called a control F5 search using the words checking or joint, uh, doing actually using both words, um, two separate searches. And I never saw any from either party that Mr. Rios paycheck went into the joint checking account. So first problem Mr. Rios has, um, in meeting his burden of clear and convincing evidence is that, um, he can't prove where this, this paycheck went. Um, uh, and also it's worth noting, um, when, uh, in, in terms, in terms, besides the fact that the FSB account was his only account, um, when he, uh, gave Ms. Rios, Ms. Salazar money for her, uh, to pay off her mortgage, uh, his testimony was that, um, on page 97, that he just wrote a check from his FSB account. He didn't deposit it into the joint account. So there's nothing, uh, in record here. Uh, so the first problem is the paychecks. And, um, the, uh, second problem is that, um, that the retirement accounts and this, um, um, Ms. Rios' trial counsel, Mr. Lannon, uh, this is on page 125 of the record basically makes the point, uh, which I think is fairly unremarkable that if you have pension benefits that are earned during the marriage, those are marital property. So Mr. Rios was getting a check, um, for pensions, uh, after he took retirement in 2011. And part of that was, would have been from the time he worked before the marriage or after the first marriage ended. And part of it was after he remarried a second time and that money was never segregated out. So there's two problems, which, uh, put, which, which is why this account was initially deemed correctly non-marital. And then, um, although that was changed, but in any this account, the funds in this account were non-marital and he didn't meet his burden. The reason that of course, we're clearing convincing evidence is one, there's the partnership theory of the marriage where, um, belief is that unless somebody can, the proponent can promote prove otherwise that the fund, any funds should be treated as part of the marriage. That's just basically the idea of the partnership, which the law, uh, favors. And the second thing, reason for the presumption of course, of marital property is the party. Usually who's trying to pursue, pursue, prove something as non-marital, um, is going to be the party with the best evidence. So in this case there, Mr. Rios didn't meet his burden. One thing I anticipate being claimed is, um, a statement by Mr. Lannan during the, during the, uh, during the, during the motion for your consideration. We're on, this is on page 127 where, um, Mr. Lannan was asked, uh, Mr. Mr. Bertrand had made the characterization in context that, uh, that all, all the only funds for the, for that would have been deposited in the account were those that were awarded in the 1991 dissolution of marriage. And Mr. Lannan said, said on page 127, if you accept whatever, what you have heard as evidence, he's probably right, but it was the evidence you actually heard, but that wasn't the evidence that was actually heard. Um, Mr. uh, the, the, uh, the, uh, pension was basically earned after the 1991 dissolution and basically until the time Mr. Rios retired. Um, so that's one part of it. Mr. Angel, in the first divorce, was there a quadro order entered, uh, on behalf of Juanita? I believe there was, and she was, she received a part of that, some portion of that retirement amount, probably whatever was 50% up to that point in time. So for, yeah, she did receive, and because that was, because it was marital property, those benefits were earned during the first marriage. So we, to answer your question, Justice Holdridge, yeah, a quadro was entered. She's been receiving, I think it's for a financial update, which he's received part of his retirement, um, funds from the first marriage, which were then marital property. He's given a portion, which then becomes... To clarify this a little bit, to clarify this, upon remarriage, Jesus worked approximately 13 months for the railroad before he officially retired. That's correct. I believe that's, uh, in the record. So your position is, is that the entitlement to some retirement benefits, uh, whatever the amount was, which is not in the record, uh, was, uh, arguably maritable at that point. Is that correct? That's correct, Your Honor. The position would be once they remarried and he's still working for the railroad and he's earning those benefits, those new benefits he's accruing, uh, once again, become marital property. For that period of time? Yeah, for that 13 months. And Mr. Rios did not segregate out that amount, um, at all. He just basically deposited it into the, um, into, into that FSB account. Um, he did, I'm preparing this. I did see in pages 99, 100, he says the money that went into there was primarily, uh, the pension funds, again, no segregation, but he was also on another note, never asked where the paycheck went. The only, uh, test, only evidence we have where those paychecks went was, uh, comment by Mr. Bertrand, which as far as I can tell, has no basis in the record. So, but yeah, the, uh, to answer your question, the amounts, uh, earned after the, after the marriage and for retirement benefits are, are marital property. And, uh, Mr. Lamp made that argument on page 125 of the record. Um, so that's the, that's the, the big issue of, because of course it dovetails into the second issue, which is dissipation. Um, um, the law is pretty clear that for, uh, there to be dissipation has to be a marital asset. So if the court would FSB account is not completely non-marital, uh, then the second issue basically moots itself because a party can't dissipate non-marital assets. But, uh, with the, the second issue was, um, a dissipation claim. Whose burden is it on dissipation? The burden on dissipation, actually it's twofold. Uh, the, the initial burden of proving a prima facie case is on Ms. Rios. But a prima facie case, as the Hamilton case, uh, reveals is not onerous. But once a prima facie case is made, uh, of dissipation, then the burden shifts to the party who spent money to explain where the funds went. So it's, so you maintain the, you maintain the prima facie case was established? Yes, we do. Why? Because a prima facie case as shown by Hamilton, it's not, it's not terribly difficult. I mean, you just basically have to have enough evidence to get in the door. And a prima facie case is basically shown by a couple elements. Uh, the first of course is establishing the irretrievable break, the date of the marriage began an irretrievable breakdown. I believe in this case, the dissipation claim was filed. Uh, I want to say August 5th of 2020. So we're not looking at anything before August 5th, 2017, really. And, um, in the Dillon case, I believe it was the Dillon case. It was the Dillon case or the Hamilton case. One of those cases, they said that the, uh, basically when the husband took out a large chunk of money, that was even though the wife may not have initially known about that's when the dissipation basically started that or the irretrievable breakdown started. So we have Mr. Rios withdrawing, I believe 4,000 on either August 26th or 29th of 2017, which was pretty unusual, especially compared to past practice, especially when you see how much he withdrew going forward. And then there's an order of protection, I believe about a month later. So by that point, it's, I think it's marriage is pretty well gone. So the first part is establishing a irretrievable breakdown date. And I think there was ample evidence there of that, but then in terms of actually the, the prima facie case, besides the irretrievable breakdown, it's, it can be proven a number of ways. One would be somebody having expenditures way beyond what they claimed. For example, I, in this case, Mr. Rios, I think list about 39,000 of expenditures per year, and he withdrew 77,000. He also had income listed on his tax returns, which was way above, I think one year was 81,000, another year was 72,000, way above where his, way above where his, his claimed income was on, on his affidavit. So between the expenditures and the, and the income, which never really showed up, you would expect if you'd have much more income than his affidavit says, the bank account statements would be going up. So on those two, based on the, on the expenditures, not only greatly increasing from what they were before, rarely did he have, I think, an expenditure over or withdrawal over 10,000, then his spending goes way beyond what it was. There's no given reason for beyond possible trips to Mexico. That was enough to shift. But isn't this his non-marital account? No, we're the first issue that's basically back to the first issue where they're claiming non-marital account. We believe it is based on the, the paid marital paychecks that were deposited in there from 2010 to 2011 and his pension, which checks, which are at least partially marital, that basically turned it into a marital account. Are you alleging, are you alleging transmutation, Mr. Angel? That, I don't know if it's really a transmutation per se. I mean, I mean, I guess that'd be, could be one way to classify Justice Davenport, but what it is with bank accounts is that there's always money going in and money going out. This is may not be a classic transmutation case where, for example, I own a house before marriage, and then I put my spouse's name on it after we get married. That's the classic transmutation. This is something where money is basically going in and going, going out. And the, the example I've came up with, it would be, for example, let's say I open a bank account a week before I get married, and then I get, my marriage is dissolved 30 years later and no evidence is presented. If I simply say this is my non-marital account, I don't think that, I don't think that carries the day. I think the presumption is going to be marital unless I do a lot more to, to do that. But basically, yeah, there is a commingling in that marital funds were deposited into this non-marital account. The pension's not disputed, and the paychecks, not only was there not any testimony as to where they went, I'm not able to figure out where else they could have possibly gone unless he just pocketed it. So, so basically, back to the dissipation, yeah, one, one necessary predicate, Justice Holdridge, is that you determine the account is marital property. If it's non-marital property, the law is pretty clear that that's, that's not, no, that's, that's not an issue. And I do see a red light. I'm, I'm sorry. Thank you, Mr. Angel. Are there any questions, more questions for him before we move on? Not for me, thank you. No. Mr. Bertrand? Mr. Bertrand? He's frozen, I believe. He's on mute. And he's frozen. He's frozen. No, he's frozen. There you are, Mr. Bertrand. Am I, am I back on? Yes, you are. Okay. Okay. You may proceed with your argument. Thank you. A couple things I want to address from the outset, and that is that the appellant is arguing that, without any basis, in fact, that the appellee's paychecks during that 13 months went into the first federal savings account. And that simply is not true. The only evidence in this record supports the fact that the only income, or the only money that passed through that account was money that Mr. Rios derived from pension payments. There's ample evidence in the record that after the remarriage in 2010, the parties had a joint checking account. Both parties testified that they put money into that joint checking account to pay joint bills. The appellant had records of the appellee's first federal savings account as far back as 2013. They presented by way of an exhibit the withdrawals from that account in order to try to substantiate some type of of dissipation claim. But never once did they attempt to, at the trial court, prove that that account contained income that was earned during the course of the marriage, which is specifically contradicted by the appellant's own testimony. And the only evidence in this case is that the only funds that passed through the first federal savings account were pension funds. And this is particularly, particularly difficult because of the fact that Mr. Rios was awarded that portion of his pension in a 1991 divorce case. And I think that now the appellate... What about the 13 months, Mr. Bertrand, that he was married, working? What about that issue? Okay, that actually was never even brought up at the trial court. It was never attempted to be at the trial court that that made the pension a commingled marital, non-marital asset, nor was it ever argued at the trial court that it was a marital asset. It was all along with both parties assumed and presented to the trial court as a non-marital asset, as was the first federal savings and loan account, non-marital asset. And I think now we're in a situation where the appellant at the appellate level for the first time is saying, oh, well, no, now we want a second bite of this apple and we want to be able to now claim that those pension funds were either all marital or at least partially marital asset without having any evidence in the record as to what portion of that pension was earned during the course of the marriage. And I guess that's of paramount importance because this pension was derived over a period of over 40 years. Mr. Bertrand, you indicated this was never argued at trial. Were there any stipulations as to characterization or classifications of assets as marital or non-marital? There was not a pretrial stipulation done in this case, so I don't believe that there was. And you're representing that no evidence was offered or admitted as to the characterization of the 13 months of pension, whether it was marital, non-marital or its value? That's correct. And both parties, even at their position papers at the trial court level and their motions for reconsideration at the trial court level, both parties agreed that not only was the first federal savings and loan account a non-marital asset, but also there was never an argument made during either of those presentations to the trial court that this pension was somehow non-marital or that a portion of it was non-marital. Does that answer your question? Thank you, sir. Go ahead. Okay. The next issue really is the dissipation claim. And that is, number one, that the court found that the first federal savings and loan account was a non-marital account. So any claim of dissipation from those funds fails from the outset. If this court decides that a portion of that account may have been a marital asset, then the question becomes, is this a dissipation claim? And has the appellant proved a prima facie case of dissipation? I think they fail on both accounts. And here's why. Mr. Rios and Mrs. Rios both testified that his entire life, Mr. Rios had relatives in Mexico. He would frequently go there four, five, six times a year. And he would frequently, as is a common cultural practice in the Hispanic community, would take funds down to Mexico for, he had parents that lived there. And that's clearly in the record, that this is a practice not only supported by his testimony, but admitted by the appellant during her testimony that, yeah, nothing changed. He continued to go to Mexico and he continued to take funds to Mexico. That wasn't something that started to occur, as Mr. Angel would suggest, oh, it's a highly unusual practice for him. Now, months before the marriage became unsalvageable, he then started to take unusual amounts of money from this account, and nobody knows what happened to him. He testified what happened to him. He took him to Mexico. He took him to family, as he had been doing his entire life. And that's not an unusual practice in that culture. With regard to the maintenance issue, I do want to touch on that. I know Mr. Angel did not have an opportunity to address that, but there are 22 pages in this trial court record that are of significant importance, pages 32 through 54, where the appellant is questioned specifically about her financial affidavit. And I believe that testimony was critical to the trial court, because the trial court, in the initial ruling and in the ruling on the motion to reconsider, basically found, I don't see that her expenses are even close to and certainly do not exceed her income of somewhere around $2,700 or $2,800 a month. And that, you know, for example, she put down that she had house expenses. She lives in a house for free. She put down that she had hair care expenses. Her daughter cuts her hair. Her daughter was a beautician. She put down that she had expenses, automobile expenses of $100 a month. And in answers on cross-examination, she said, I haven't spent $100 to repair my car in a whole year. Mr. Bertrand, are you indicating then that the expenses are determinative of whether a person receives maintenance or not? I think it is. It's not determinative, but it certainly is a factor. And I think it's a key factor here that the trial court grasped was a key factor, was that her monthly income far exceeded her monthly expenses. And according to the statutory factors, the need of a party is a factor to be considered in whether or not the court should award maintenance. Basically here, she had $3,000 or nearly $3,000 a month in income and actual expenses of less than $1,000. So, according to paragraph 82, that is a factor that is considered by the court. And it's a factor that the trial court, in this case, grasped upon quite readily. And the other thing that I want to address here is that the decisions in the rulings of the trial court only have to be supported by some evidence and be consistent with the applicable laws. And I think that is something that this court needs to be cognizant of, and that is that this is a manifest weight argument that in order to reverse any ruling here by the trial court, the court has to find that there was no evidence to support the trial court's decision, and that the trial court's decision was completely contrary to the law and the facts in order to require any type of reversal. So, unless there are any other questions. I have a question, Mr. Bertrand. Okay. After the parties remarried, didn't Mrs. Rios continue to receive half of the pension? She didn't. She didn't receive half. Her portion, her marital portion of the pension in 1991 from that divorce, I think totaled right around $500. And yes, she continued to receive it. She continues to receive it today. Okay. Thank you. Are there any questions for... Are you completed? I'm sorry. I'm done, Your Honor. Thank you. Are there any questions for Mr. Bertrand? No. No. Okay. Mr. Angel, any rebuttal? Thank you, Justice McDade. Just briefly addressing some of the points Mr. Bertrand made. With respect to saying that this wasn't contested as marital, I think page 165 of the records, Mr. Lannon's position paper for Mrs. Rios says it was. And otherwise, I don't know why the trial judge would have found it as marital and given her a portion of it initially. Also, he's making note that we have the records back to 2013, but that basically, that's just trying to shift the burden of proof. The burden of proof in this case was on Mr. Rios to prove the funds were his non-marital property. Any doubts are resolved in favor of finding it marital. And he made a point of saying it was difficult regarding when this was accumulated, basically saying that there's no duty to segregate out the marital portion from the non-marital. But otherwise, I mean, where would that end? I mean, it could have been, he could have worked for another 10 years after the marriage and applying Mr. Rios, Mr. Bertrand's logic, he wouldn't have any obligation to do it. So, I don't think it makes a difference whether he worked one year or 10 years. The fact of the matter is he worked, part of that pension became marital property. He also had a paycheck, which the burden of proving where that went would be on Mr. Rios, especially when he says this is my only account. And with respect to the dissipation, there was a part in the record where I think he said it never went over 10,000 per year. And now, as far as what he gave, then this is something where it went from, the number of trips actually was different based on who you asked. Mr. Bertrand is represented as four to six. I believe in the record, Mr. Rios said it was two to four. And Ms. Rios said it was two to three. But this is something where his expenses went way beyond the 10,000. I mean, it was, he had expenses, I think, listed at 39,000. He's withdrawing almost twice that amount in terms of 77,000 in 2018. So, on the expenses, where did they come from? Was there a financial affidavit produced by Mr. Rios? Yes, there was. There was one of the affidavits. Justice Holdridge, I can't remember if it was the 2018 or 2020. I know he filed two of them. But one of the expenses, oh, let's see, I'm sorry, it was 2018, I think, was the financial affidavit where he listed $39,576. And he's withdrawing way above that amount, especially after marriage. What did those expenses on that affidavit refer to? Expenses of what? You're talking about the financial affidavit. I think, I mean, basically, I think those are his living expenses. Basically, I think it's everything that's in your typical financial affidavit, and it totaled up to $39,500. So, the expenses, Mr. Angel, are living expenses, is that correct? Right. Okay, well, is there a second number called gifts? I think there is something where it says gifts, but that would be added into the living expenses on that financial affidavit. And I know he didn't list $39,000 in gifts. I know that much was not the case. There is a line on that financial affidavit form. I'm not sure where it is, but that's part of it. But that is one part of it is that. And then on the maintenance, I didn't address that before, but Mr. Bertrand addressed that. And I'm not here, basically, saying we should retry the case. But the statute just says that needs is one factor. And Justice Davenport asked the question, is expenses determinative? And Mr. Bertrand says it's a factor, but the way this was treated is it was basically in the entire thing. And while we can agree about deference to some evidence in the weight standard, that presumes the entire statute is followed. There's, I think, like 12 different factors, and those should all be considered to determine whether an award's appropriate, not whether it's needed. And the expenses that Mr. Rios claimed, I think were about $3,000 or so. And they're saying that Ms. Rios can live on less than $1,000, which I don't think is realistic. So what is our standard review on maintenance? I mean, normally, I think it would be a manifest weight or maybe abuse of discretion. I mean, I realized that to some degree, there's deference to the trial court's finding of facts. I mean, if the trial judge didn't believe her, the trial judge has a right to do that. But that being said, the trial judge, I think, still needs to determine what an appropriate award is and needs. It's just one factor, especially when you have basically a second marriage between the parties for what that's worth. And you have a wide disparity in incomes where she's making less than half of what he makes. So all that should have been considered rather than just, I don't believe her expenses are legitimate, and therefore, I'm going to not award her anything. Thank you. Are there any other questions? No. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.